## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  08-050 (RMU)** |
| | : | |
| **TREVELL TREMAINE HICKS,** | : | |
| | : | **Status: June 12, 2008** |
| **Defendant.** | : | |
| _____ | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
### TO SUPPRESS IDENTIFICATION EVIDENCE

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes Defendant's Motion to Suppress Tangible Evidence. In support of its opposition, the Government relies on the following points and authorities and such points and authorities as may be cited at a hearing on the motion.

### FACTUAL BACKGROUND

On February 8, 2008, officers with the Metropolitan Police Department (MPD) were conducting narcotic observations in the parking lot of an apartment complex in the 1700 block of Benning Road, N.E.  At approximately 12:30 a.m., an under cover officer (UC) observed the defendant and an unknown buyer walk onto the lot from Benning Road.  The two men stopped in front of a burgundy Dodge Stratus that was parked on the lot and had a conversation.  The buyer handed the defendant some money and the defendant walked over to the driver's side of the Stratus. The defendant opened the driver's  door of the Stratus.  The UC saw the defendant bend over and reach into the driver's side of the car.   After a few seconds, the defendant came back out of the Stratus with an object in his hand, shut the door, and walked around the rear of the Stratus toward the buyer.  The defendant approached the buyer and the buyer handed a cigarette to the defendant.

The UC watched the defendant unscrew the top from a vial that he was holding in his hand and dip the cigarette into the vial. The defendant handed the cigarette to the buyer and screwed the cap back onto the vial.  The defendant walked back to the Stratus, opened the driver's-side door and leaned inside.  After a few seconds, the defendant closed the door and walked toward an apartment building next to the parking lot.  At the same time, the buyer was walking out of the parking lot toward 17th Street.  The UC radioed the arrest team that was waiting nearby.  In the broadcast, the UC provided the arrest team with a description of the defendant and informed them that the defendant was entering an apartment building.  The UC officer directed the arrest team to the apartment building and as they approached the building they could see the defendant standing in the lobby with several women. The defendant stepped out of the door to the building and was immediately stopped.  The defendant was identified by the UC as the person engaged in drug transactions and placed under arrest.

The officers searched the defendant and recovered $576 from his right front pants pocket. They did not recover keys to the Stratus.  However, Officer Chaplin went to the Stratus and when he shined his flashlight into the Stratus he saw a bottle of PCP in the map pocket on the driver's side door.  Officer Bauserman used a "slim Jim" to unlock the door to the Stratus.  The officers entered the Stratus and recovered two full half-ounce bottles of PCP and another one-ounce bottle that was approximately 1/4 full of PCP from the map pocket on the driver's door.  In addition, they recovered a loaded (9 rounds) Glock 21 .45-cal semiautomatic pistol under the driver's seat.  The Stratus was not registered to the defendant, but personal papers in the name of the defendant were recovered from the glove compartment.

## ARGUMENT

In his motion, the defendant broadly asserts, without any factual support, that the identification of the defendant was unduly suggestive.  On the contrary, the identification of the defendant in this case was immediately after the UC observed the defendant distribute PCP.  In fact, there was no "identification procedure" because the UC never really lost sight of the defendant.  The UC saw the defendant enter an apartment building and could see the defendant through a window, standing inside the lobby of the building.  Therefore, the officers had probable cause to arrest the defendant based on the observations and directions from the UC.

**I.      The Officers Had Reasonable, Articulable Suspicion to Stop the Defendant, and Probable Cause to Arrest Him.**

Terry v. Ohio, 392 U.S. 1 (1968) permits police officers to temporarily "seize" a person under certain circumstances, namely in brief encounters between a citizen and the police on public streets, which require swift action because of observations the officer has made.  Id. at 20.  The officer may briefly "seize," or detain the citizen if he has a reasonable, articulable suspicion that "criminal activity may be afoot."  Id. at 30.  The officer need not be certain that the citizen is engaged in criminal activity; reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  Thus, a Terry stop may be conducted simply "on the need to 'check out' a reasonable suspicion."  United States v. Clark, 24 F.3d 299, 303 (D.C. Cir. 1994).

Because such a stop may occur on a reasonable suspicion, whether such suspicion existed in a particular situation is determined by the totality of the circumstances.  Courts may not scrutinize each possible factor upon which the officer relied on in a separate and distinct manner.  United States

v. Sokolow, 490 U.S. 1, 8-9 (1989).  "An officer on the beat does not encounter discrete, hermetically sealed facts," and for that reason while "a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors – especially when viewed through the eyes of an experienced officer – may."  United States v. Edmonds, 240 F.3d 55, 59-60 (D.C. Cir. 2001).

In the instant situation, the arrest team had reasonable articulable suspicion to conduct a Terry stop of the defendant because he fit the description provided by the UC as the individual, who had distributed narcotics moments before.  The officers had the authority to briefly detain the defendant until his identity could be confirmed, which would certainly provide probable cause to proceed to arrest.  "Probable cause to arrest requires the existence of facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense."  United States v. Wesley, 293 F.3d 541, 545 (D.C. Cir. 2002) (quotations and citations omitted) .  The probable cause standard merely requires the showing of a "fair probability" that a crime has been or is being committed.  See Illinois v. Gates, 462 U.S. 213, 246 (1983) ("probable cause does not demand the certainty we associate with formal trials[;] [i]t is enough that there was a fair probability").

## II.     The Identification of the Defendant Was Reliable and Not Suggestive

Defendant argues that the show-up procedure involving the UC was unduly suggestive, and therefore not reliable.  The reliability of a witness's identification is the key to its admissibility. Manson v. Brathwaite, 432 U.S. 98 (1977).  Factors to be considered in determining the reliability of an identification procedure include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of

4

the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length

of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199 (1972). Courts

have further noted that if a trained law enforcement officer, who is "expert" in observing criminals,

is the individual making the identification, that factor bolsters the reliability of the identification.

United States v. Dring, 930 F.2d 687, 693 (9th Cir. 1991), cert. denied, 506 U.S. 836 (1992).

It is not disputed that show-up identifications such as the one used in this case are suggestive.

See, e.g., Singleton v. United States, 702 F.2d 1159, 1166-67 (D.C. Cir. 1983); Russell v. United

States, 408 F.2d 1280, 1284 (D.C. Cir. 1968); cert. denied, 395 U.S. 928 (1969). However, such

methods have been long approved as being a reliable method for the identification of suspects.

Singleton, 702 F.2d at 1166; Russell, 408 F.2d at 1284; Wise v. United States, 383 F.2d 206, 209

(D.C. Cir. 1967); cert. denied, 390 U.S. 964 (1968). In fact, the Court in Russell recognized:

"[b]alancing all the doubts left by the mysteries of human perception and recognition, it appears that

prompt confrontations . . . will 'if anything, promote fairness by assuring reliability . . .'" Russell 408

F.2d at 1284. Evidence found to be reliable is admissible, and the suggestiveness of the procedure

goes to the weight of evidence, which is for the jury to decide. Singleton, 702 F.2d at 1166.

In the instant case, the identification of the defendant is very reliable. First, the UC, Officer

Daxaneous Banks, is a trained undercover officer who understands the importance of his role in

identifying the correct individual. Second, Officer Banks had the opportunity to view the defendant

for several minutes while the narcotics transaction was being conducted. Third, because he

understood the importance of a correct identification, and because his own personal safety was at

stake, Officer Banks' degree of attention, to the defendant and to his surroundings, was very high.

Fourth, Officer Banks directed the arrest team to the precise location where Officer Banks still had

5

the defendant under observation and the defendant was the only one in that area who fit that description provided by Officer Banks.  Fifth, Officer Banks was certain he identified the right person.  Finally, the time between Officer Banks' observations and the show-up was very short, just a matter of minutes, and thus the identification was still very fresh in Officer Banks' memory.

Thus, the only thing that could defeat the reliability, and thus the admissibility, of Officer Banks' identification is if the show-up procedure "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] . . . was denied due process of law."  Russell, 408 F.2d at 1284 (internal quotations and citations omitted).  However, the Russell court also stated that "we have previously held that absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations."  Id.  There are no special elements of unfairness in this case, and defendant cannot point to any, to warrant the suppression of the out-of-court, or in-court, identification of the defendant by Officer Banks.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, the United States respectfully requests that this

Honorable Court deny the defendant's Motion Suppress Identification Evidence.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610


By:     _____/s/_____
CHARLES NEIL FLOYD
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W., Rm. 4243
Washington, D.C. 20530
(202) 305-2195

7